*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re C. J. LONGSTAFF, Minor.

UNPUBLISHED
June 27, 2019

No. 346445
Oakland Circuit Court
Family Division
LC No. 2015-836482-NA

Before: BECKERING, P.J., and CAVANAGH and RONAYNE KRAUSE, JJ.

PER CURIAM.

Respondent-mother appeals by right the trial court's order terminating her parental rights to her minor child pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j). We affirm.

## I. STATUTORY GROUNDS FOR TERMINATION

Respondent first argues that the trial court erred by finding clear and convincing evidence to support termination of her parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). We disagree. We review a trial court's determination regarding a statutory ground for termination for clear error. MCR 3.977(K); *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). "A finding of fact is clearly erroneous where the reviewing court is left with a definite and firm conviction that a mistake has been made." *In re Terry*, 240 Mich App 14, 22; 610 NW2d 563 (2000). When reviewing a trial court's findings of fact, we give deference to the special opportunity of the trial court to judge the credibility of the witnesses. *In re Fried*, 266 Mich App 535, 541; 702 NW2d 192 (2005).

The trial court found that termination of respondent's parental rights was justified under MCL 712A.19b(3)(c)(*i*), (g), and (j), which, at the time the trial court entered its order, permitted termination under the following circumstances:

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

-1-

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The trial court did not clearly err by finding that clear and convincing evidence supported termination of respondent's parental rights pursuant to MCL 712A.19b(3)(c)(*i*). Respondent does not dispute that the statutory 182-day period had elapsed by the time the trial court entered its order. Indeed, the initial dispositional order was issued in December 2015 and the termination order was entered almost three years later in October 2018. The case was initiated because authorities discovered drug paraphernalia in respondent's home, including the child's bedroom, respondent had repeatedly tested positive for cocaine, and respondent was arrested after being found intoxicated in a Walmart dressing room while the two-year-old child ran around the store unsupervised and in an unkempt condition. Respondent admitted that she had used cocaine off and on throughout her life and, by the time the petition was filed, she had been using it again for three months. During the proceedings, respondent was required to remain substance free, but drug screens showed that she continued to occasionally use cocaine. Respondent even visited the child several times with drugs in her system. On the day of the last positive drug screen, respondent visited the child, was particularly agitated, and constantly yelled at him and the worker. In addition to the positive screens for cocaine, respondent also repeatedly missed screens and also tested positive for alcohol. By the last month of the case, respondent had stopped the court-ordered, random screening at JAMS altogether. The trial court did not clearly err by concluding that the substance abuse problem continued to exist.

In addition, respondent's physical health and mental health had been concerns since the beginning of the case. Respondent had numerous physical conditions, including lupus, epilepsy, and a heart condition. Before the case began, the police discovered respondent on the side of the road after she suffered from a seizure. Respondent and the agency created a safety plan—requiring another adult's presence when respondent was with the child—to ensure his care if she had a seizure. But respondent repeatedly failed to maintain the relationships with the people she chose for the safety plan and, by the end of the case, there was nobody identified on the record and approved by the agency to keep the child safe under these circumstances. Respondent had also been diagnosed with bipolar disorder, post-traumatic stress disorder, attention deficit hyperactivity disorder, and substance-abuse dependence. Despite being prescribed medications and being referred for therapy, respondent often appeared to be in a manic state. At times in the

proceedings, respondent was not honest about therapy attendance, she did not take her medications as prescribed,[1] and she took prescription medications without a prescription. By the end of the case, the foster care worker and the caseworker both had concerns about respondent's diminishing mental health.

Safe housing and income were also persistent issues in the case. Although respondent leased suitable homes throughout the proceedings, she failed to achieve stability because she frequently moved. In addition, she failed to maintain a consistent roommate and instead became embroiled in conflict with those she had entrusted to keep the child safe if she had a seizure. Late in the case, respondent was arrested at her home for domestic violence against her best friend and roommate, ML. During that incident, she reported that she was feeling homicidal and stated that "if her child was taken away, we will all know what would happen." By the end of the case, respondent was living at an address that she had never provided to the agency. Moreover, she was planning to marry and share the home with a man she had never met, but claimed to be the former commanding general of the United States Army Central and deputy commander of the United States forces in Afghanistan.

Respondent never provided her caseworker, Amanda Blackwell[2], with sufficient verification of the various sources of income that she claimed and the trial court found that her testimony regarding her employment and earnings was not credible. As the case came to a close in September 2018, respondent claimed to be depending on financial assistance from her alleged boyfriend, the Unites States general, while she awaited the outcome of her Social Security disability application, which she first began in 2016. Although respondent claims on appeal that she was not physically able to "have a job with good documentation," she asserted during the proceedings that she was able to work and did not need Social Security disability benefits.

Finally, respondent's parenting abilities were called into question throughout the case. Again, before the petition was filed, drug paraphernalia was observed in the child's bedroom and the child was running around Walmart unsupervised before respondent was arrested in the dressing room. Respondent attended parenting classes, but the caseworker, Blackwell, opined that she did not benefit from the classes. Blackwell testified that respondent did not display control at visits, she failed to follow through with discipline, and her expectations for the child were not age-appropriate. The child's behavior during parenting time worsened throughout the case. Moreover, respondent put her own interests ahead of the child's interests. For example, she canceled visits when she was angry at the agency about the manner in which the visits were scheduled. In addition, if respondent became upset because of her lack of control over the child during parenting time, she would cry and start talking about the case in front of him. Such discussion agitated the child and he would cover his ears. Finally, as the trial court found,

---

[1] At one visit, when respondent had not taken her medication, she was observed speaking rapidly, without connecting sentences, and she was unable to engage in discussions about the child's health.

[2] Blackwell apparently married near the end of the proceedings and became Amanda Blackwell Provey.

respondent canceled the child's medically-necessary eye surgery and she filed a false complaint with Child Protective Services (CPS) that resulted in the child's difficult move to his fifth foster home. Although the record established that respondent brought fun activities and snacks to enjoy during visits, the parenting time supervisor testified that respondent's parenting continued to be a "work in progress."

Respondent asserts that the trial court made various erroneous factual findings, but she has not demonstrated clear error in the court's determination that MCL 712A.19b(3)(c)(*i*) supported termination. Respondent claims that the trial court erroneously concluded that the agency was never provided a completion certificate for the drug-treatment program at Recovery Consultants ("RCI"), and respondent failed to complete a drug treatment program. While these findings do not explain respondent's reason for not completing the RCI program, namely lack of insurance coverage to attend both RCI and Easterseals, they are not erroneous. Respondent in fact did not complete the RCI program. Moreover, although she was receiving substance abuse treatment from Easterseals, Blackwell testified that the treatment was not complete, but rather was ongoing. In light of this evidence, respondent cannot establish clear error.

Respondent argues that the trial court erred by finding that she consistently presented as manic. But the Easterseals caseworker, Megan Montgomery, testified that she had received reports that respondent "continues to present as manic." When asked if Montgomery had observed that behavior, Montgomery stated that respondent "does present with fast-paced speech and is highly verbal." On cross-examination during the statutory-basis hearing, respondent acknowledged that she was "bouncing all over [the] chair, fidgeting with [her] hands, talking fast, jumping from subject to subject." Respondent testified that these behaviors were her "baseline." In light of this evidence, respondent cannot establish clear error.

Respondent argues that the trial court erred by finding that she had been evicted from her home after an altercation with ML and that she no longer has suitable housing. Respondent claims that there was no evidence that she was evicted, but ML reported to Blackwell that respondent's bills were not being paid and they had received eviction notices. Moreover, given that respondent had not informed the agency of her latest move, the home had not been assessed by the agency, and nobody living in the home had been approved to support respondent's safety plan for the child in the event of a seizure, the trial court did not clearly err by concluding that the home was not suitable.

Respondent argues that the trial court erred by finding that she was responsible for the child's move to the last foster home. Respondent correctly notes that the fourth foster family had already filed its 30-day notice by the time she filed the false CPS complaint alleging abuse. But the record indicates that the family had been considering keeping the child, but then requested immediate removal as a result of the false complaint. In light of this evidence, respondent cannot establish clear error.

Respondent argues that she was punished because the court, petitioner, and Blackwell did not like her demeanor and loudness, and she maintains that her demeanor would not affect her ability to parent the child. Respondent was argumentative with agency staff and repeatedly made false accusations against the agency that it had contaminated her drug screens or was a baby-broker. She also repeatedly threatened Blackwell, telling her and her supervisor in June 2016

that "we would get what's coming to us," and telling Blackwell in August 2018 that "[y]ou better watch it, bitch; I'm coming for you." Despite respondent's claim that her demeanor would play no role in parenting, the court found that respondent's demeanor demonstrated that she could not control herself. Blackwell testified that respondent's aggressiveness was a barrier to proper parenting.

In sum, by the time of the statutory-basis hearing, respondent's substance abuse, physical and mental health, housing, income, and parenting issues remained unresolved. We are not left with a definite and firm conviction that a mistake was made when the court concluded that the conditions that led to the adjudication continued to exist. Moreover, given respondent's lack of progress after almost three years and her lack of effort at the end of the case with regard to drug testing and communication with the agency, the trial court did not clearly err by finding that there was no reasonable likelihood that respondent would resolve her continuing issues within a reasonable time. Clear and convincing evidence supported a statutory basis for termination under MCL 712A.19b(3)(c)(*i*). If at least one ground for termination exists, this Court need not consider the additional grounds on which the trial court based its decision. *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

## II. MCR 3.977(H)(1)(b)

Respondent also argues that the trial court violated MCR 3.977(H)(1)(b) because 16 months elapsed between the filing of the supplemental petition and the trial court's decision. Because respondent never objected on this basis below, this issue is unpreserved. Accordingly, we review the issue for "plain error affecting substantial rights." *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008). MCR 3.977(H)(1)(b) provides that "[t]he hearing on a supplemental petition for termination of parental rights under this subrule must be held within 42 days after the filing of the supplemental petition," but also provides that "[t]he court may, for good cause shown, extend the period for an additional 21 days."

The supplemental petition was filed on June 15, 2017, and the hearing on the supplemental petition began on June 29, 2017. Respondent cannot establish any error under MCR 3.977(H)(1)(b). To the extent that respondent argues that she was prejudiced by the length of the statutory-basis/best-interest hearing, respondent contributed to the delay when her attorney requested an adjournment. Moreover, as petitioner argues, respondent called the bulk of the witnesses in the seven-day proceeding. In addition, respondent was not prejudiced by the delay because it provided her with additional time to comply with her parent-agency treatment plan ("PATP"). In any event, even if respondent could establish a violation of the court rule, because the rule does not provide sanctions for any violation, failure to comply with the time requirements in the rule does not require dismissal of a termination order. See *In re Jackson*, 199 Mich App 22, 28-29; 501 NW2d 182 (1993).

## III. REASONABLE EFFORTS

Respondent also argues that petitioner failed to make reasonable efforts at reunification. Petitioner has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights. MCL 712A.18f(3)(b) and (c); MCL 712A.19a(2); *In re Mason*, 486 Mich at 152. Although petitioner "has a responsibility to expend reasonable efforts to

provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). "Not only must respondent cooperate and participate in the services, she must benefit from them." *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014).

The agency provided referrals for respondent to be evaluated by a psychologist in 2015. Respondent also received therapy, substance abuse treatment, and psychiatric care through Easterseals. Because respondent's seizure history precluded her from driving, the agency gave her rides to visitation at the agency until she threatened the workers, at which time, the agency still provided bus passes. To further accommodate respondent's health issues and avoid requiring respondent to stand in long lines at drug testing facilities, the agency screened respondent at its office. When respondent complained that the agency's testing was inaccurate, the agency provided bus passes for respondent to go to a testing facility. Urine tests were also funded when respondent could not stop talking enough for the testing facility to complete an oral examination. Without citation to the record, respondent complains that Blackwell only communicated with Easterseals three or four times, and never contacted the therapist. But the record shows meaningful communication by Blackwell to Easterseals. For example, Blackwell informed Easterseals that respondent was filling her prescriptions for Adderall, but not taking it, and as a result, her prescription was changed. Moreover, when respondent refused to communicate at all with the agency at the end of the case, Blackwell continued to consult Easterseals. For almost three years, the agency made efforts to help respondent, even when respondent failed to cooperate. *In re TK*, 306 Mich App at 711.

Respondent also complains that the agency did not make reasonable efforts related to the child. Citing the child's five foster homes, respondent claims that the agency failed to place the child in a stable foster home. During the first three moves, the child had short periods of adjustment and then would do well. But as respondent notes, the last move was traumatic for the child. As discussed earlier, however, respondent's decision to file a false complaint against the fourth foster family caused its request for his immediate removal. Respondent complains that there was a delay in obtaining therapy for the child afterward, but Blackwell testified that by the hearing on October 3, 2017, respondent had requested therapy for the child and the agency had made the referral. Subsequent delays for about three months resulted from the provider's slow response and respondent's own lack of cooperation. Respondent canceled the child's first appointment. In addition, when respondent attended another appointment with the child, she caused so much stress for him that he was afraid to return for subsequent appointments and required a new counselor to be hired for in-home services. Despite enduring many foster home transitions and requiring counseling, the record establishes that the child was doing well in his fifth foster home and at kindergarten by September 2018.

Respondent does not explain how additional communication between the agency and Easterseals would have caused her to overcome her continued issues with substance abuse, mental health, housing, income, contact with the agency, parenting skills, and domestically violent relationships. The child was only subjected to various foster care placements for nearly three years because respondent's issues persisted. Although respondent's relationship with the child was strained by the end of the case, it was respondent's issues that supported the statutory grounds for termination.

For these reasons, we reject this claim of error.

## IV. BEST INTERESTS

Respondent asserts that the case should have never reached the best-interest stage and that termination of her parental rights was not in the child's best interests in any event. We disagree. As addressed earlier in this opinion, the trial court did not clearly err by finding that termination of respondent's parental rights was justified under MCL 712A.19b(3)(c)(*i*).

Once a statutory ground for termination is established, the trial court shall order termination of parental rights if it finds that termination is in the child's best interests. MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). The trial court should weigh all the evidence available to it in determining a child's best interests. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). Factors relevant to a determination of a child's best interests include the child's bond to the parent, the parent's compliance with his or her case service plan, the parent's history of visitation with the child, the child's need for permanency, stability, and finality, the advantages of a foster home over the parent's home, and the possibility of adoption. *Id*. at 713-714. We review for clear error a trial court's determination regarding a child's best interests. MCR 3.977(K); *In re Mason*, 486 Mich at 152.

A preponderance of the evidence supports the trial court's determination that termination of respondent's parental rights was in the child's best interests. The record establishes that respondent loves the child. Throughout the case, however, the child appeared more excited to see what respondent had brought him and to see ML than he was to see respondent. By the last year of the case, the child's behavior problems increased during visitation and respondent was unable to follow through with discipline. Eventually, the child appeared nervous and "very scared" when he would see respondent and told his foster parent, "I don't want to see other mom." Although respondent had requested therapy for the child, she thwarted the process by focusing on her own case during his intake appointment, canceling one of his appointments, and preventing the therapist from talking to the child during another appointment to create a treatment plan.

Respondent did not comply with the requirements of her PATP related to substance abuse, mental health, housing, income, contact with the agency, parenting skills, and domestically violent relationships. By the end of the proceedings, she had moved again and failed to inform the agency where she was living. As a result, the home had not been evaluated. After respondent obtained personal protection orders against her previous two roommates—her brother and her best friend—nobody else was approved by the agency for the safety plan.

By contrast, the child's foster home was stable. The foster parents owned their home and both worked to support the child. The child's therapist, Sarah Dominguez, testified that she had seen the foster parents offer guidance and calm the child down, and the child would go to them for guidance and support. Dominguez opined that the child's foster parents provide a supportive environment and they are interested in participating in therapy to help the child. In addition, the foster parents are planning to care for the child long-term.

Dominguez testified that consistency and a stable environment were important for the child. She opined that a disruption in services or environment would result in a setback for the child and could cause significant behavioral issues. Dominguez opined that if the child is in a resilient home with enough support, he will continue to get better and that process could take years.

Respondent's failure to overcome her many issues and her lack of stability, which Blackwell described as a rollercoaster, supersedes the love that she has for the child. Given the child's need for stability and a parent who could facilitate, not hamper, his need for therapy, the trial court did not clearly err by finding that termination of respondent's parental rights was in the child's best interests.

Affirmed.

/s/ Jane M. Beckering
/s/ Mark J. Cavanagh
/s/ Amy Ronayne Krause